In the
UNITED STATES DISTRICT COURT
for the SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SUSAN J. MEEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *vs.* | ) | CAUSE NO.   1:09-cv-890-JMS-TAB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY**

In August 2008, the Social Security Administration decided that Susan Meek≈s eligibility for the disability benefits she had been receiving since August 2001 ended as of August 2005. Ms. Meek seeks judicial review of that decision.   For the reasons stated herein, the decision terminating Ms. Meek≈s benefits is affirmed.

Judicial review of the Commissioner of Social Security≈s factual findings is deferential: courts must affirm if the findings are supported by substantial evidence in the record.   42 U.S.C. ' 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).   Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.   *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).   If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner≈s decision, then it is substantial evidence.   *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).   This limited scope of judicial review derives from the principle that Congress has designated the

1

Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.   Our task is limited to determining whether the ALJ=s factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).   *Carradine*, 360 F.3d at 758.   While review of the Commissioner=s factual findings is deferential, review of his legal conclusions is *de novo*.  *Richardson*, *supra*.

Under the Social Security Act, disability is defined as the Ainability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months@.   42 U.S.C. ' ' 416(I) and 423(d)(1)(A).   A person will be determined to be disabled only if his impairments Aare of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.@   42 U.S.C. ' 423(d)(2)(A).   The combined effect of all of a claimant=s impairments shall be considered throughout the disability determination process.   42 USC ' 423(d)(2)(B).

Ms. Meek applied for Disability Insurance Benefits (ADIB@)[1] in February 2001, (R. 186), claiming that she had bipolar disorder, post traumatic stress disorder, anxiety disorder, and arthritis

---

[1] Claimants who have achieved insured status through employment and withheld premiums are eligible for Disability Insurance Benefits (ADIB@), 42 U.S.C. ' 423, *et seq.*, while uninsured individuals who meet certain income and resource criteria are eligible for Supplemental Security Income disability benefits (ASSI@), 42 U.S.C. ' 1381, *et seq*.   Ms. Meek had been receiving DIB benefits.

in her knees and hands, (R. 190), which limited her ability to work because she was afraid to be around people, she could not get along with people, and her feet and hands ached, (*id*.).   On its initial review, the state agency found that Ms. Meek was disabled based on a primary diagnosis of borderline intellectual functioning, a secondary diagnosis of cyclothymic disorder,[2] and satisfaction of Listing 12.05C for mental retardation.   (R. 114, 353, 357).   It was determined that her disability began on June 30, 2000.   (R. 113, 303).

The Commissioner periodically performs a continued disability review (ACDR@) of a DIB recipient=s eligibility for benefits.   20 C.F.R. ' ' 404.1589 and 404.1590.   The CDR follows an eight-step sequential process:

1.   Is the recipient engaging in substantial gainful activity?   If she is, her disability status has ceased.

2.   Does the recipient have an impairment or combination of impairments which meets or equals the severity of a Listed impairment?   If she does, her disability status continues.

3.   Has there been medical improvement, meaning a decrease in the medical severity of the recipient=s impairments which were present at the time of the most recent favorable decision that the recipient was disabled?   If there has been no improvement in her impairments, then the evaluation proceeds to step 5; otherwise, the evaluation continues to step 4.

---

[2] AA disorder of the mood marked by alternating hypomatic (mild manic) periods and depressive periods; a milder form of bipolar disorder (which see).   Also called *affective personality disorder*, *cycloid personality disorder*, and *cyclothymic personality disorder.*@   J. E. Schmidt, *Attorneys=Dictionary of Medicine and Word Finder* at C-538 (Dec. 2009).

4.   Is the medical improvement related to the recipient=s ability to do work?   This step determines whether or not there has been an increase in the recipient=s residual functional capacity based on the impairments that were present at the time of the most recent favorable disability decision.   If medical improvement is related to the ability to work, then the evaluation proceeds to step 6.   Otherwise, the evaluation continues to step 5.

5.   Do any of the exceptions to medical improvement apply?   If none apply, the recipient=s disability will be found to continue.   If one of the first group of exceptions apply, the evaluation continues to step 6.   If one of the second group of exceptions apply, then the recipient=s disability will be found to have ended.

The first group of exceptions describe those limited situations where, despite no decrease in the severity of a recipient=s impairments, she should no longer be, or never should have been, considered disabled.   These exceptions are:

    a.   the recipient is the beneficiary of advances in medical or vocational therapy or technology that is related to her ability to work.

    b.   the recipient has undergone vocational therapy which affects her ability to perform work.

    c.   based on new or improved diagnostic or evaluative techniques, the recipient=s impairments are not as disabling as they were found to have been.

    d.   any prior disability determination was in error.

    e.   the recipient is currently engaged in substantial gainful activity.

The second group of exceptions, leading to a finding that the recipient=s disability has ceased, are:

    a.   a prior disability determination was fraudulently obtained.

    b.   the recipient does not cooperate with the continued disability review.

    c.  the recipient cannot be found.

    d.  the recipient fails to follow prescribed treatment which would be expected to restore her ability to engage in work.

    6.  If medical improvement is related to a recipient=s ability to do work or one of the first group of exceptions to medical improvement applies, are all of the recipient=s impairments in combination severe?   If the combination of impairment is not severe, then the recipient=s disability will be found to have ceased.   If the combination is severe, the evaluation continues.

    7.  Can the recipient perform her past relevant work?   If she can, she is not disabled.   If she cannot, the evaluation proceeds.

    8.  Considering the recipient=s RFC, age, education, and work experience, can the recipient do other work?

20 C.F.R. ' ' 404.1594(d), (e), and (f).

      The state agency=s initial decision on a continued disability review is based on a review of the evidence.   20 C.F.R. ' 416.1402(b).   If a recipient is dissatisfied with the initial decision, then she may request reconsideration.   *Id*. ' 416.1407, *et seq*.   A reconsideration decision is made by a state-agency disability hearing officer (ADHO@) after holding a hearing.   *Id*., ' ' 416.1413(d), 416.1414, and 416.1415.   If dissatisfied with the reconsideration decision, a recipient may request a hearing before an administrative law judge (AALJ@), an official of the Social Security Administration.   *Id*., ' 416.1429, *et seq*.   If dissatisfied with the ALJ=s decision, the recipient may request review by the Social Security Administration=s Appeals Council.   *Id*. ' 416.1466 *et seq*.   If the Appeals Council denies review or affirms the ALJ=s decision, the decision becomes the final decision of the Commissioner.   *Id*. ' 416.1481.   The recipient may then seek judicial review of the Commissioner=s decision by filing suit.   42 U.S.C. ' 405(g).

The state agency commenced a CDR of Ms. Meek≤s eligibility in 2004.   On initial review, it determined that her disability had ceased.   (R. 112, 166).   She requested reconsideration.   (R. 164).   A reconsideration hearing before a disability hearing officer was held in January 2006, and the hearing officer decided that Ms. Meek was no longer disabled.   (R. 143, 146).   Ms. Meeks received a hearing before an ALJ in July 2008, (R. 776).   In August 2008, the ALJ issued his decision finding that Ms. Meek≤s disability had ended three years earlier, as of August 11, 2005, (R. 96, 104), the date of the state agency≤s initial CDR determination, (R. 166).   The Appeals Council≤s denial of Ms. Meek≤s request for review, (R. 8), rendered the ALJ≤s decision the final decision of the Commissioner for judicial review.

The ALJ found at step one of the eight-step CDR process that Ms. Meeks was not engaged in substantial gainful activity.   (R. 98).

At the second step, he found that, as of August 11, 2005, Ms. Meek had the impairments of bipolar disorder, lymphedema[3] of the left arm, degenerative disc disease of the lumbar spine with nerve involvement, obesity, osteoarthritis of the knees, and sleep apnea, (*id*.), but that none of these impairments, singly or in combination, met or medically equaled the severity of any of the Listing of Impairments since August 11, 2005, (R. 100).

---

[3] ΑEdema (swelling), usually of a limb or limbs, due to an abnormal accumulation of fluid in the tissues, which is the result of an obstruction of lymph vessels or lymph nodes.≅   *Attorneys= Dictionary of Medicine* at L-221.

At the third and fourth steps, the ALJ wrote that, by August 11, 2005, there had been medical improvement that was related to Ms. Meek≈s ability to work, (R. 101), but he actually found that a step-five exception to medical improvement applied:   the initial disability decision based on satisfaction of Listing 12.05C for mental retardation was erroneous.   He found that there was no documented evidence of mental retardation.   (*Id.*)   Because an erroneous prior determination is one of the first group of exceptions to medical improvement, the ALJ proceeded to the sixth step.

At step six, the ALJ found that Ms. Meek≈s impairments are severe.   (*Id.*)

At the seventh step, the ALJ found that, as of August 11, 2005, Ms. Meek had the RFC to perform the full range of light work except for a restriction to simple, routine tasks having limited contact with others.   Ms. Meek had no past relevant work that she could perform.

At the eighth step, the ALJ concluded that, given her RFC for light work with restriction, her age, her limited eighth-grade education, and her lack of any work skills, she had the ability to perform a significant number of jobs in the national economy as of August 11, 2005 and was, therefore, no longer disabled.   The ALJ relied on the hearing testimony of a vocational expert regarding the number of available jobs.

**Discussion**

Reading Ms. Meek≈s disjointed opening brief generously, the Court discerns three possible arguments therein, all related to what she claims is Athe primary ground of her disability@ and her Amost serious impairment,@ (Plaintiff≈s Brief in Support of Her Complaint (dkt. 16) (ABrief@) at 1, 2):   her spinal impairment, which is a disc protrusion with nerve involvement causing immobility

7

and pain.   Her most explicit argument is that the ALJ erred in finding that medical improvement

had occurred because, while he mentioned Ms. Meek=s degenerative disc disease, he failed to

mention her disc protrusion with nerve involvement and there is no substantial evidence showing

that this impairment had improved by that time.   Next, she argues that her disk impairment

satisfies Listing 1.04.   Finally, she argues that the ALJ=s credibility determination is faulty

because he failed to Arefer to her ruptured disc with attendant pain nor her state of mind upon

presenting to him under heavy medications.@   (Brief at 9).

  **Medical improvement.**   Ms. Meek misunderstands the medical-improvement inquiry

and the ALJ=s finding.   Step three of the eight-step CDR process examines whether there has been

Amedical improvement,@ 20 C.F.R. ' 404.1594(f)(3), meaning Aany decrease in the medical

severity of your impairment(s) which was present at the time of the most recent favorable medical

decision that you were disabled or continued to be disabled,@ 20 C.F.R. ' 404.1594(b)(1).   The

impairments for which Ms. Meek was found to be disabled in 2001 were borderline intellectual

functioning, cyclothymic disorder, and satisfaction of the Listing for mental retardation.   The

Record does not support that a disc or spine condition contributed to the finding of disability or

even was present at that time.   Ms. Meek acknowledges, in fact, that her disc condition   Ahad

come to be diagnosed@ only Ain the interim, meaning [*sic*] from the time Meek was awarded

disability benefits in 2000 [*sic*].@   (Brief at 2).   The first mention of the disorder in the Record

occurs in an October 31, 2005 report of a pain medicine consultation by David M. Ratzman, M.D.

(R. 395).   In this report, Dr. Ratzman interprets an x-ray and a MRI scan, performed on August

24, 2005 and October 28, 2005 respectively, as showing disc dehydration consistent with

degenerative disc disease at lumbar vertebrae 4 and 5, with a broad-based disc bulge and

high-intensity zone consistent with an annular tear at this level.   (R. 396).   The MRI was also

interpreted by Mark Coe, M.D., as showing a mild disc bulge between lumbar vertebrae 4 and 5

with degenerative changes, and a disc protrusion between lumbar vertebra 5 and sacral vertebra 1

that likely touches the traversing left S1 nerve root.   (R. 391).   As this evidence was created four

years after Ms. Meek=s last favorable disability determination, a medical improvement evaluation

of the condition was not only not required but impossible as part of the CDR because the condition

played no part in that determination.

   **Satisfaction of Listing 1.04.**   Ms. Meek argues that her disc or spinal condition meets

Listing 1.04 and, thus, satisfies the second step of the eight-step CDR process.   However, she

does not attempt to show how the condition meets the Listing=s criteria.   Her argument consists of

a series of five statements:   (1) Dr. Ratzman reported that Ms. Meek has disc dehydration

consistent with degenerative disc disease at L4-5 with broad-based disc bulge and high intensity

zone consistent with an annular tear; (2) Dr. Ratzman=s report records that Ms. Meek has a history

of intractable low back pain; (3) the MRI showed disc protrusion with nerve involvement; (4) there

is resulting substantial immobility and pain with movement; and (5) Ms. Meek is heavily

medicated for lymphedema and low back pain.   She concludes by asserting that A[t]he inability to

move or lift or climb without pain (Tr. 411) from a ruptured an inoperable disc does not permit

employment as is recognized by the SSA.@   (Brief at 8).

   Listing 1.04 requires:

      1.04   *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal
   arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
   arthritis, vertebral fracture), resulting in compromise of a nerve root (including the
   cauda equina) or the spinal cord.   With:

A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.   Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, ' 1.04.   While Dr. Ratzman=s report, (R. 395), and Dr. Coe=s MRI report, (R. 391), could support the diagnostic criteria of the Listing, because they tend to show that Ms. Meek had degenerative disc disease with some kind of involvement of a nerve root,[4] none of her statements come close to demonstrating that the specific A, B, or C severity criteria of the Listing are satisfied.

Ms. Meek asserts that the ALJ failed to discuss her ruptured disc or whether it met the Listing.   But the ALJ specifically identified the MRI findings with nerve-root impact, (R. 99),[5] and specifically discussed that Listing 1.04 was not satisfied as of August 11, 2005 because there

---

[4] Dr. Coe=s report states that the disc protrusion Atouches@ or Acontacts@ a nerve root.   It is uncertain on the Record whether this would constitute Acompromise@ of the nerve root under the Listing.

[5] AOn October 28, 2005, a lumbar MRI showed degenerative disc and joint disease of the lumbar spine with L5-S1 protrusion contacts traversing left S1 nerve root (Exhibit 14F, p. 1).@

was no evidence showing the Listing≈s severity criteria, such as sensory or reflex loss, positive straight-leg raising (the tests that were done were negative), muscle atrophy, or motor loss.   (R. 100).   He also noted that Ms. Meek did not require an assistive device, she had normal gait and station, heel-toe standing, squatting, and was able to bend without difficulty.   (*Id.*)   Ms. Meek has not shown that the ALJ≈s Listing 1.04 finding was erroneous.

**Credibility determination.**   The ALJ found that Ms. Meek≈s descriptions of her symptoms were not credible Åin light of the devastating results of the MMPI set out in Exhibit 9F. Given this objectively established attempt to exaggerate and fake, I have resolved any conflict in the evidence which relies on her truthfulness against her absent other substantiation.@   (R. 102). The ALJ refers to the July 2005 administration of the Minnesota Multiphase Personality Inventory by Jerome Modlick, Psy.D., a clinical psychologist.   The state agency had requested Dr. Modlick to perform a psychological evaluation of Ms. Meek.   (R. 315).   Dr. Modlick reported that the results were Åcompletely invalid and the product of a deliberate attempt at over reporting and ›faking bad=.@   (R. 316).   He found that her scores demonstrated that she was over reporting her psychiatric troubles and Åalso deliberately attempting to deny any strengths or resiliency.@   His diagnostic impression was malingering.

Ms. Meek argues that the ALJ≈s reliance on Dr. Modlick≈s report of malingering was erroneous because it Åfails to refer to Meek≈s ruptured disc with attendant pain nor her state of mind upon presenting to him under heavy medications.   It would take no physician to conclude that such things as cognition and memory would be affected by the likes of Meek≈s prescriptions.@ (Brief at 9).   Ms. Meek points to no evidence in the Record tending to show that her low-back pain or her medications would or could account for her apparently faked MMPI responses.   Contrary

11

to Ms. Meek=s gratuitous assertion, it *would* take expert medical opinion to find that her

medications would have so affected her cognition and/or memory as to produce such Afalse fake@

MMPI responses.   Dr. Modlick was, in fact, aware of Ms. Meek=s medications, (R. 320), and did

not find that they could account, even in part, for her malingering responses.   Moreover, Ms.

Meek does not identify any particular finding of the ALJ that was erroneous due to his conclusion

regarding her lack of credibility.   She has challenged only his finding regarding whether her

spinal impairment met Listing 1.04 and that determination depended on the absence of specific

required objective medical signs of severity, unrelated to the credibility of her reports of her

symptoms.[6]

       Ms. Meek has not shown that the ALJ=s credibility finding was erroneous.

       **Reply arguments.**   The above arguments were made in Ms. Meek=s opening Brief.   In

her longer Reply to the Commissioner=s Response, she shifted gears entirely, raising new

arguments and contradicting positions asserted in her opening Brief.   She now argues that her

Aprimary impairment was mental retardation,@ not her disc impairment, (Reply at 2), and she

abandons her argument that her disc impairment met Listing 1.04.   She now argues that there is no

evidence that shows medical improvement in her mental retardation, which was found to have met

Listing 12.05C, and that her mental retardation explains her apparently malingering responses to

Dr. Modlick=s MMPI test and, thus, undercuts the ALJ=s credibility finding based thereon.

       Arguments raised for the first time in a reply brief are forfeited.   *Narducci v. Moore*, 572

---

[6] In her Reply, Ms. Meek recognized the irrelevancy of her credibility to the ALJ=s Listings
determination.   (Reply at 13).

F.3d 313, 324-25 (7th Cir. 2009) (Athe district court is entitled to find that an argument raised for the first time in a reply brief is forfeited@).   This Court has applied this fundamental principle in judicial reviews of Social Security disability decisions.   See, *e. g.*, *Imhausen v. Astrue*, No. 1:07-cv-0833-DFH-TAB, Entry on Judicial Review (doc. 17) at 12 n. 1, 2008 WL 623139, *6 n. 1 (S.D. Ind., March 04, 2008), and *Kendrick v. Barnhart*, No. 1:04-cv-0292-DFH-TAB, Entry on Judicial Review (doc. 29) at 26, 2005 WL 1025777, *12 (S.D. Ind., April 18, 2005).   Plaintiffs cannot be allowed to reserve arguments for their replies and thereby sandbag the Commissioner who has no opportunity to respond.   Ms. Meek offered no explanation for failing to raise her arguments earlier.   The Court notes that Ms. Meek=s counsel wrote a letter to the ALJ shortly after his decision was issued in which counsel expressed the essence of the Reply=s arguments regarding evidence of Ms. Meek=s mental retardation and its impact on Dr. Modlick=s finding of malingering. (R. 742).   Thus, in addition to being available to counsel at the time of his opening Brief, the Reply arguments were largely articulated by him well over a year before he filed his opening Brief. There is no excuse for waiting until Ms. Meek=s Reply to assert them.   The Court finds that the arguments raised in Ms. Meek=s Reply are forfeited.

If the arguments were not forfeited, they are unconvincing nonetheless.   The core of Ms. Meek=s Reply argument is that she meets the Listing for mental retardation, 112.05C, and the ALJ simply dropped the Listing finding without substantial evidence.   The Disability Determination and Transmittal forms on which the state agency=s reviewers recorded their evaluations of Ms. Meek=s disability in 2001 state that she had a primary diagnosis of borderline intellectual functioning and a secondary diagnosis of cyclothymic disorder, and that she satisfied Listing 12.05C.   (R. 113, 114).   The Listing finding was made by Chang-Wuk Kang, M.D., who

completed a Psychiatric Review Technique form, (R. 353), in which he marked boxes indicating

that Ms. Meek meets the Listing, (R. 353, 357).   Dr. Kang explained that his finding was based on

Ms. Meek⹀s scores on an IQ test administered in 2000 or 2001 by Howard E. Wooden, Ph.D.,

HSSP, a licensed clinical psychologist and board-certified.   (R. 303, 365).   Her scores were a full

scale IQ of 73, verbal IQ of 70, and performance IQ of 80.   (R. 280).

> Listing 12.05C reads, in part:
>
> 12.05    *Mental Retardation*:   Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in
> A, B, C, or D are satisfied.
> \*          \*          \*
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional and significant
> work-related limitation of function;
> \*          \*          \*

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, ' 12.05.   Dr. Kang apparently found that Ms. Meek

met the Listing on the basis of her verbal IQ score of 70 during Dr. Wooden⹀s examination.   He

did not reference any evidence in the Record showing a diagnosis of mental retardation and did not

reference any evidence showing deficits in adaptive functioning initially manifested during Ms.

Meek⹀s developmental period, before age 22.

The ALJ had substantial evidence for finding that the state agency⹀s finding that Listing

12.05C was met was erroneous.   None of the evidence from Ms. Meek⹀s treating sources includes

a diagnosis of mental retardation.   Dr. Wooden, who examined Ms. Meek and administered the

subject IQ test, did not diagnose her as mentally retarded.   In fact, the diagnosis appears nowhere

else in the Record except for Dr. Kang=s finding.   Ms. Meek pointed to no evidence from any

treating or examining source finding that signs of mental retardation existed prior to age

twenty-two.   Instead, the prevalent diagnosis in the Record is that Ms. Meek suffers from

borderline intellectual functioning, which is a separate and less severe diagnosis than mental

retardation.[7]   This was Dr. Wooden=s diagnosis after administering and interpreting the IQ test.

He also assigned Ms. Meek a Global Assessment of Functioning rating of 65.[8]   In addition, Dr.

Modlick, who examined Ms. Meek twice, stated that he strongly suspected that Dr. Wooden=s IQ

scores were low and he definitely stated that Ms. Meek was not retarded.   (R. 322).   He found

that she was demonstrating Arather straightforward malingering@ during his first exam, (*id*.), and,

as described above, she demonstrated more deliberately fake responses during his second exam.

Substantial evidence supports the ALJ=s decision that the state agency=s finding that Ms.

Meek met the criteria of Listing 12.05C was in error and, therefore, constituted an exception to the

requirement for medical improvement.

---

[7] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (ADSM-IV-TR@), at 740 (2000)

[8] A GAF score of 61 to 70 indicates:   A**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**.@   *DSM-IV-TR* at 34.

15

**Conclusion**

Ms. Meek has not shown that the ALJ=s decision was not supported by substantial evidence

or that it was the result of legal error.   Therefore, the Commissioner=s decision terminating Ms.

Meek=s disability benefits is **AFFIRMED**.

**SO ORDERED.**

Date:   08/16/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Thomas E. Kieper, Assistant United States Attorney
tom.kieper@usdoj.gov

Thomas E. Williams, Attorney at law
teqw@aol.com